1998 D.S.D. 36

Mike CALHOON and Lee Calhoon, d/b/a Calhoon Ranch, Inc., Ray Burtz, Sylvia Bear and Georgianne Bear, Plaintiffs,

v.

Jim SELL, Richard Colombe, Paul Valandra, William DuBray, Trust of Nancy Patronaggio, Greenwood Township, Star Valley Township, Tripp County, South Dakota, Rosebud Sioux Tribe, and the United States of America, Defendants.

No. 96–3038.

United States District Court,
D. South Dakota,
Central Division.

Sept. 30, 1998.

John M. Grossenburg, Winner, SD, for Plaintiffs.

John Simpson, Simpson Law Office, Winner, SD, for Jim Sell.

Paul Valandra, Mission, SD, pro se.

Terry L. Pechota, Viken, Viken, Pechota, Leach & Dewell, Rapid City, SD, Eric J. Antoine, Rosebud, SD, for William DuBray, Trust of Nancy Patronaggio and Rosebud Sioux Tribe.

Kent E. Lehr, Ulmer Hertz & Bertsch, Menno, SD, for Greenwood Township.

Alvin R. Pahlke, Winner, SD, for Tripp County, South Dakota.

Cheryl Schremp DuPris, U.S. Attorney's Office, Pierre, SD, for United States of America.

## MEMORANDUM OPINION

KORNMANN, District Judge.

### INTRODUCTION

[¶ 1] Plaintiffs instituted this action under 28 U.S.C. §§ 1331, 1343, 1346(f), 1353, and 1367, and 25 U.S.C. § 1302(8). Plaintiffs seek a declaratory judgment to the effect that a portion of a road running from Ideal, South Dakota, to Presho, South Dakota, which portion is located in Star Valley and Greenwood Townships of Tripp County, South Dakota, is a public highway. Plaintiffs also seek compensatory and punitive damages against defendants Sell and Valandra only and an injunction preventing Sell, Colombe, and Valandra from obstructing this portion of the road. Plaintiffs claim that Sell, Colombe, and Valandra have illegally placed gates across a public highway, obstructing travel between the Calhoon ranch home and some of the Calhoon ranch land. The individual defendants claim that the gates can be easily opened and closed, that the gates are closed only part of the year, that gates are a fact of life in this part of the state, and that the road in question is not a public highway. Greenwood Township claims that Tripp County has the sole responsibility for the road and that the road is still a part of the county highway system. Star Valley Township has not answered or appeared. The Rosebud Sioux Tribe ("Tribe") contends the Court does not have jurisdiction over the Tribe based upon the allegations in the complaint and based upon a claim of sovereign immunity of the Tribe. Yet the Tribe asserts legal rights and interpretations of federal law and is the beneficial owner of two tracts at issue here. Following a pretrial conference, the Court met with the parties and viewed the road in question on November 7, 1997. Trial to the Court was conducted on December 8, 1997. Extensive briefs, arguments and documents have since been submitted. The Court has previously dismissed the action against Tribal Land Enterprises (TLE), there having been no objection from any party as to such action. Both the Tribe and the United States have moved to dismiss as to them. The United States, the Department of Interior ("Department") and the Secretary of the Interior ("Secretary") generally act, as to Indian affairs, through the Bureau of Indian Affairs (BIA).

[¶ 2] Legal descriptions will be provided with the section listed first, followed by the township number and range number. All townships are "north" and all ranges are "west."

### PREVIOUS LITIGATION IN STATE COURT

[¶ 3] Mike Calhoon, Lee Calhoon, Ray Burtz, Sylvia Bear, and Georgianne Bear filed a lawsuit in state court against Jim Sell, the same having been filed in Tripp County, 6th Judicial Circuit, as Civ. 94–93. The state court entered findings of fact and conclusions of law and a preliminary injunction on September 22, 1994, prohibiting Sell from, during the pendency of the action, obstructing any portion of the road, referred to by the state court as "a public section-line highway", for the three miles as it proceeds from U.S. Highway 183 east through Greenwood Township and for that portion of the road as it runs through 6–102–76. Plaintiffs were required to post a $9,000 bond to obtain the injunction. This order would have covered gates 1, 2, 3, 4, 5 and 6 as shown on plaintiffs' exhibit 1 as received in federal court. The parties attempted to designate this action by the state court as a "final order" and thus subject to appeal. The court, however, failed to comply with the requirements of the state equivalent of Fed.R.Civ.P. 54(b) and the South Dakota Supreme Court, on April 5, 1996, dismissed plaintiffs' appeal. The state trial court amended the preliminary injunction by an order filed on September 12, 1996, and by an identical order filed on January 9, 1997, to allow Sell to close gates 3 and 4 from September 22, 1996, until November 1, 1996. The state court ruled on September 10, 1996, that there were other indispensable party defendants, namely the United States, acting

through the BIA, the Tribe, Tripp County, TLE, Richard Colombe, Greenwood and Star Valley Townships, William DuBray and Nancy Patronaggio. The plaintiffs were ordered to join such parties and this order was filed on September 12, 1996. For some unknown reason, an identical order was signed again by the state court on January 7, 1997, the same having been filed on January 9, 1997. On February 27, 1997, an order of the state court was filed denying the motion of Sell to dismiss and granting the motion of plaintiffs to continue the state court action until the status of the road in question is decided in federal court, reference having been made to the present action. Apparently, even at that late date, plaintiffs had not complied with the earlier orders to attempt to join indispensable parties in the state court action which attempts, as to some of the defendants, would have been unsuccessful given the law applicable to the Tribe, TLE, and the United States.

[¶ 4] One or more of the plaintiffs requested Tripp County on July 16, 1996, to act pursuant to SDCL 31–25–6 to permit horizontal livestock guards to be constructed pursuant to SDCL 31–25–4, the guards to replace the two gates on the ends of the section of highway in question. The county took no action and one or more plaintiffs then proceeded to appeal to a state circuit court. What has transpired with regard to that matter is unclear from the record before the court.

## OPINION

[¶ 5] The facts of this case and the mesh of statutory and case law, in the lyrical words of Tevye, pose problems "that would cross a Rabbi's eyes." This case also brings to mind the admonition that some questions should perhaps not be asked and, if asked, are sometimes better left unanswered. The parties, however, seek answers and the court will rule on the issues.

 [¶ 6] No citation of authority is required to state that Indian tribes and their governing bodies enjoy common-law immunity from suit. No suit may be brought in federal court in the absence of an express and unequivocal waiver of immunity by the tribe or abrogation of this tribal immunity by Congress. The Tribe has here refused to waive its immunity and has sought to be "excused" from this lawsuit. This is a curious position, given the proprietary interest of the Tribe in two of the land parcels which border this road and given what one would think would be a general interest in federal questions concerning takings of Tribal and allotted trust land without the payment of compensation. One would think a tribe would want to be a "player" rather than a "spectator" in this matter. But that is not the case. There is clearly no abrogation of the Tribe's immunity by reason of an Act of Congress. The Court lacks jurisdiction over the Tribe because of sovereign immunity.

 [¶ 7] The United States also vigorously asserts that sovereign immunity has not been waived and that the court lacks jurisdiction as to the United States. The United States is an indispensable party defendant in a condemnation proceeding brought by a State to acquire a right of way over lands which the United States owns in fee and holds in trust for Indian allottees. *Minnesota v. United States*, 305 U.S. 382, 386, 59 S.Ct. 292, 83 L.Ed. 235 (1939). The reasoning behind this proposition is, of course, that the United States is the owner in fee of the Indian allotted lands and holds the same in trust for the allottees. The fact that the United States is an indispensable party does not, of course, establish that jurisdiction exists over the United States.

 [¶ 8] This is a suit which seeks, in part, to divest the United States of any right to manage and use certain Indian trust land. Strangely enough, the United States does not oppose this attempt and joins in the request to take and use certain trust land, namely that trust land that borders section lines, although no compensation was ever paid for such takings and use, although proper procedures were not

employed under 25 U.S.C. § 311 to grant permission for the use of such trust land for highway purposes, and although the grantee of the easement has abandoned for many years what was received from the United States. The United States sets forth its position: "Moreover, for purposes of this litigation, the United States does not dispute the existence of the section line right of way." (Doc. # 28, page 7) The United States urges that the land along section lines is part of a county highway, that no substantial federal question is presented and that the alleged federal claim is immaterial, being made solely for the purpose of obtaining federal jurisdiction. *Id.* The United States claims, correctly so, that federal sovereign immunity protects the United States from suit "in the absence of an express waiver of this immunity from Congress." *Block v. North Dakota*, 461 U.S. 273, 280, 103 S.Ct. 1811, 1816, 75 L.Ed.2d 840 (1983). Any effective waiver must be "unequivocally expressed," and such consent to be sued is to be construed "strictly in favor of the sovereign." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34, 112 S.Ct. 1011, 1014–15, 117 L.Ed.2d 181 (1992).

[¶ 9] The Quiet Title Act, 28 U.S.C. § 2409a, provides, in part: "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights. This section does not apply to trust or restricted Indian lands * * *." 28 U.S.C. § 2409a(a) (1978). The United States Supreme Court has held that "[o]nly upon passage of the QTA did the United States waive its immunity with respect to suits involving title to land." *Block*, 461 U.S. at 280, 103 S.Ct. at 1816. "The Supreme Court has noted that 'when the United States claims an interest in real property based on that property's status as trust or restricted Indian lands, the Quiet Title Act does not waive the government's immunity.' *United States v. Mottaz*, 476 U.S. 834, 843, 106 S.Ct. 2224, 2230, 90 L.Ed.2d 841 (1986)." *State of Alaska v.*

*Babbitt*, 38 F.3d 1068, 1073 (9th Cir.1994). The 9th Circuit rejected the argument of the State of Alaska that the QTA does not apply to actions in which the State is not asserting a title interest but is seeking "only" to claim highway rights-of-way. *Id.*, at 1073.

[¶ 10] In the present case, the United States is supporting the position of the plaintiffs to the effect that there is a public highway across trust land although (1) the highway was "established", in part, on the section lines without any compensation being determined or required as to the thirty three feet taken from an "Indian parcel" as the parcel borders a section line, and (2) the entire highway for which an easement was granted has been abandoned by the grantee of the easement. The exception in the QTA was intended to protect Native Americans. If the United States is to be entitled to rely on the exception, it must be acting to protect Native Americans. As was said in *Ducheneaux v. Secretary of Interior of U.S.*, 837 F.2d 340, 342 (8th Cir.1988) : "This court, in *Spaeth v. United States Secretary of the Interior*, 757 F.2d 937 (8th Cir.1985), has also held that the QTA bars actions to adjudicate a disputed title to Indian real property *in which the United States claims an interest.*" (emphasis supplied). Here, the United States claims no such interest. The United States has presented no evidence and no argument to show a "substantial possibility" that the section line highways are "trust or restricted Indian lands" so as to come within the exception in the QTA. Again, quoting from *Ducheneaux* at page 343: "The *Spaeth* court concluded that if the United States showed a substantial possibility that the lands in dispute were 'trust or restricted Indian lands,' then the QTA applied to bar appellants' suit against the United States. *Id.* at 943." The Court of Appeals in *Spaeth* found "that section 2409a does provide the requisite consent * * * unless the United States can prove that there is a 'substantial' possibility that the lands in question are 'trust or restricted Indian lands.' *Newman v.*

*United States,* 504 F.Supp. 1176, 1179 (D.Ariz.1981)." *Id.* at 943. It is clear that in *Newman* the government was claiming that the land in dispute was Indian land and that the question was substantial. After discussing the principle of a substantial claim, the court in *Newman* stated: "The Court finds that this principle is applicable in cases where the Government asserts an interest in lands it claims falls within the exception to § 2409a. Accordingly, the only issue to be resolved is *whether the United States has raised such a claim* in this instance." *Newman* at 1179. (emphasis supplied).

[¶ 11] The United States has shown nothing with regard to a valid claim to the Indian land on the section lines in this case although others have made such a showing. The United States claims in this action that the question is not substantial. The United States pays no heed to the actions of Tripp County. There is something inherently wrong with allowing the federal government to assert sovereign immunity where the purpose of the exception to the QTA is being directly frustrated by the government. It would be a different matter under the QTA if the United States was attempting to protect the trust property. In other words, there is nothing for plaintiffs to challenge as against the United States since the United States has taken the position that it agrees with the challenge. "In this regard, the legislative history behind the § 2409a(a) exception discloses that Congress intended to prevent prejudice to Indian rights and to prevent the abridgment of 'the historic relationship between the Federal Government and the Indians without the consent of the Indians.' Quiet Title Act, Pub.L. 92–562, 1972 U.S.Code Cong. & Admin. News, pp. 4547, 4557." *Newman* at 1178.

■ [¶ 12] The doctrine of sovereign immunity also does not apply when the court is required to examine an agency decision where the government officer's powers are limited by statute and the actions of the official are ultra vires or, in the alternative, the actions taken are unconstitutional. *State of Alaska v. Babbitt,* 38 F.3d 1068,

1076 (9th Cir.1994), citing *Washington v. Udall,* 417 F.2d 1310, 1314 (9th Cir.1969). The Court is not unmindful of *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), and its progeny.

[¶ 13] Under § 5 of the General Allotment Act, Act of February 8, 1887, c. 119, 24 Stat. 388, 389, U.S.C. Title 25, § 348, the Indians' interest in these allotted lands was subject to restraints on alienation. By § 2 of the Indian Reorganization Act, Act of June 18, 1934, c. 576, 48 Stat. 984, U.S.C. Title 25, § 462, restraints on alienation were extended. The Secretary acted in direct violation of the restraints on alienation, by not requiring compensation for trust lands as they border section lines. 25 U.S.C. § 348 provides in pertinent part: "And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void* * *." The Secretary did not even attempt to describe the grant or conveyance on section lines. But if the Secretary did intend to make such a conveyance or contract, the same was null and void from the beginning. Federal jurisdiction exists not only in connection with the issuance of an allotment in the first instance but also in connection with claims that deal with improvident grants of rights-of-way in connection with allotted lands. *Loring v. United States,* 610 F.2d 649 (9th Cir.1979). The facts here show more than "improvident grants". The Secretary attempted to give away Indian lands in clear violation of law and the rights of the Indians. This order does not impact the federal treasury or any essential operations of the federal government. It simply orders the cessation of the use of Indian land without just compensation and due process of law.

■ [¶ 14] Plaintiffs, by seeking a declaration that the entire road is a "public highway", are attempting to exclude persons who are in whole or in part of Indian

blood or descent who are entitled to the allotments. In hindsight, it may have been preferable for the court to have *sua sponte* added as parties defendant all Native Americans who hold allotments which plaintiffs and the United States seek to impact, the Tribe having alleged in its answer that such persons are indispensable parties. No party, however, moved to add such persons. This is a suit involving the interests and rights of Indians in their allotments. It clearly involves the rights of defendants William DuBray and Nancy Patronaggio as the successors in interest of Alfred DuBray and Ollie DuBray and these parties allege and have proven that plaintiffs seek to interfere with their rights and interests in allotted trust property, namely T 2860. This suit involves the rights of persons of Indian blood or descent to allotments of land under "any Act of Congress or treaty" and jurisdiction thus exists under 28 U.S.C. § 1353. This section is a recodification of the jurisdictional portion of 25 U.S.C. § 345 and it is the latter section upon which most courts have concentrated. Both sections represent a limited consent by the United States to be sued. *Scholder v. United States*, 428 F.2d 1123 (9th Cir.1970), cert. den. 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246.

[¶ 15] It was not argued in *Scholder* that § 1353 grants greater rights than § 345 but that may well be the case. 28 U.S.C. § 1353 is of greater scope than 25 U.S.C. § 345 because it grants original jurisdiction "of any civil action involving the right of any person * * * to any allotment of land * * *." In other words, the well pleaded complaint rule need not be applied. The complaint in the present case does plead and involve rights of Indians to allotments and thus, even under the well pleaded complaint rule, jurisdiction exists. The earlier statute, 25 U.S.C. § 345, is not particularly well written. The statute authorizes Indians to "commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto* * * and said circuit courts (district courts) are given jurisdiction to try and determine any

action * * * involving the right of any person * * * to any allotment of land * * *." It would seem that a fair reading of this would tell us that the claim to the allotment may arise by way of starting the lawsuit or defending the lawsuit. Yet the same sentence (which comprises the entire paragraph and the entire statute) goes on to provide that "* * * in said suit the parties thereto shall be the claimant as plaintiff and the United States as party defendant * * *." All of this may be a distinction without a difference since jurisdiction exists under either or both statutes or based upon other grounds for federal jurisdiction as already discussed.

[¶ 16] This short section of the road in dispute begins in Greenwood Township, Tripp County, S.D., at an intersection of U.S. Highway 183 and certain land within the township. The road as built first proceeds for one mile east along a section line. On the south side of the section line, we find 3–102–77 with the west half (i.e. one-half mile) of 3 being Tribal trust land with a designation of T 2614 and the east half (i.e. one-half mile) being fee or deeded land which has been such since 1929. On the north side of the section line, we find 34–103–77, all deeded land as it borders the road, the SE ¼ of 34 having been deeded land since 1909. The United States conveyed an undivided one-half interest in the SW ¼ of section 34 in 1985. There is no evidence when the other 50% interest in the SW ¼ of 34 became deeded land.

[¶ 17] For the next or second mile, the road proceeds on the section line for the first half mile. It then "dips" to the south of the section line as it enters the second half mile of this segment and then rejoins the section line. The road in this segment actually meanders slightly, both north and south of the section line. On the south side of this one mile segment, we find 2–102–77 (2 as it borders the road being allotted land described as A 2611.5). On the north we find 35–103–77. The west half (i.e. one-half mile) of section 35 has been fee land

since 1917 (Exh. 117) and the east half (i.e. one-half mile) of 35 is generally allotted land (the SE ¼ of 35 being ⅚ allotted and ⅙ fee land) with a designation of A 2357.5.

[¶ 18] For the third mile, the road proceeds on the section line for almost the entire mile. It is bordered on the south by 1–102–77 (I being allotted land with a designation of A 2611 as it borders the road). It is bordered on the north by 36–103–77 (the west half of 36 as it borders the road being Tribal trust land with a designation of T 2860 and the east half as it borders the road being allotted land with a designation of A 2601). As the road reaches a point 900 feet west of the southeast corner of 36–103–77, it turns to the southeast and crosses the northeast corner of the NE ¼ (allotted land with a designation of A 2611) of 1–102–77.

[¶ 19] The road, as it proceeds generally southeast, next enters into Star Valley Township, Tripp County, S.D., crossing into the NW ¼ of 6–102–76 (this NW ¼ being allotted land with a designation of A 2606). Continuing somewhat diagonally through section 6, it proceeds into the SW ¼ (which has been fee or deeded land since 1907 (Exh. 113)) and then into the SE ¼ (which is allotted land with a designation of A 2615).

[¶ 20] The road then leaves 6–102–76 and proceeds into the NE ¼ (which is allotted land with a designation of A 2616) of 7–102–76. It then enters the NW ¼ of 8–102–76 (which is fee or deeded land, although no evidence is found in the record as to how long the same has been fee land). Still in section 8, it next enters the SW ¼ (which is allotted land with a designation of A 2640) and proceeds to a point on the south section line approximately 0.4 miles east of the southwest corner of section 8.

[¶ 21] Plaintiffs submitted 12 numbered maps as plaintiffs' exhibit 123. In looking at the maps, the court wondered about the use of the words "quarter corner", thinking there must be at least four, if not more, such corners in every section. Research discloses, however, that a "quarter

corner", as distinguished from a "section corner," in government surveys means the corner on a section line midway between the section corners. *Rud v. Board of Comr's of Pope County,* 66 Minn. 358, 68 N.W. 1062 (1896). The first 4 maps have no relevance in this action. A "map of acquisition of right of way" (map #5) which map was approved by the Department on November 9, 1916, shows the right of way as "dipping" into the NW ¼ (which is allotted land with a designation of A 2601) of 17–102–76 as it proceeds to the southeast. It proceeds all in A 2601 until, at a point 539.8 feet south of the north quarter corner of section 17, the roadway straddles the north-south quarter line of section 17 and then proceeds straight south down the quarter line. A second "map of acquisition of right of way" (map #6) "matches up" with map #5 and shows half the roadway being taken from A 2598.5 starting 539.8 feet south of the north quarter corner of section 17, continuing all the way down the north-south quarter line of section 17. The road as actually constructed, beginning where the "as-built" road enters section 17 and continuing generally east and then south, was not constructed and does not exist today in accordance with either of these "maps of acquisition". In other words, the county did nothing to ever utilize the permission granted to use section 17. Instead, they proceeded east along the section line, and then built a road that runs both east and south at the northeast corner of section 17.

[¶ 22] There is no evidence that anyone has employed a surveyor to actually compare any of the road "as built" with the section lines or with the "maps of acquisition." It is therefore impossible to determine in some locations, based on the evidence before the court, as to exactly how the "as built" road matches with the "maps of acquisition." Even where the road is in close proximity to section lines, it is difficult to determine exactly where the road is located "as built." Map 8, which shows the highway passing diagonally through A 2615, is in conflict with map 9. Map 9

shows the highway in 6–102–76 as all in the west half (a/k/a lots 4 and 5) of section 6 whereas map 8 shows the highway crossing the north-south quarter line in section 6 at a point 1,234 feet north of the south quarter corner of section 6. The result is that the highway segments could not connect and there is no indication of any grant by the United States of any right to build a highway which would be connected together in this area, namely the west half of section 6. To further confuse matters, plaintiff's exhibit 2 (which apparently came from the BIA) shows no road at all touching either the east section line or the north-south quarter line of 17–102–76, such exhibit showing only a north-south road in the middle of 16–102–76.

[¶ 23] Page 4 of plaintiffs' exhibit 122 is a "map of acquisition" to cover that portion of the road "as built" which runs in the NE ¼ (A 2616) of 7–102–76. The road then crosses fee land in the NW ¼ of 8–102–76 and there is no evidence in the record as to how this road portion was obtained.

[¶ 24] Contrary to the layout of the road as described above, the road as actually constructed "dips" into the NW ¼ (which is allotted land with a designation of A 2601) of 17–102–76 as it then turns generally eastward, meandering slightly to the south of the north section line of 17, and then follows the section line east (being bordered on the north by the SE ¼, allotted land with a description of A 2639, of 8–102–76, and bordered on the south by the NE ¼, allotted land with a description of A 2598.5, of Section 17) to the southwest corner of 9–102–76. The road then continues east along the section line (being bordered on the north by the SW ¼, allotted land with a description of A 4807, of 9–102–67, and on the south by the NW ¼, deeded or fee land but as to which there is no evidence of the date the same became fee land, of 16–102–76) to a point approximately 0.6 miles west of the northeast corner of 16–102–76. The road continues east and north to the town of Ideal, S.D. It also continues, as built, on the section line, south from the northeast corner of 17–102–

76. There is also a highway constructed to run north and south on the quarter line of 16–102–76 and this highway connects with the east-west road as built on the south section line of 9–102–76.

[¶ 25] The United States held and continues to hold in trust the rangeland units with a description preface of A for allotted land and T for tribal land. The United States intended these maps as described above to meet the requirements of 25 U.S.C. § 311. No rights were granted to Greenwood or Star Valley Townships. The maps and 25 U.S.C. § 311 do not address the question of whether the easements may or may not be assigned by Tripp County to other units of local government and there is no evidence of any assignment or attempted assignment. No mention is made of a reversion if the county fails to use the roadway for the purposes authorized by the Secretary. There is no indication that, under South Dakota law, the county could transfer the road or any portion thereof to a township, especially in the absence of a deed and there is no deed.

[¶ 26] As shown by plaintiffs' exhibit 1, there are eleven gates along the road in question. Two gates are on the section line between 34–103–77 and 3–102–77. Gate 1 is near the western end of the border between these two sections and gate 2 is near the eastern end. Gate 3 is on the section line between 35–103–77 and 2–102–77, near where the road makes a slight deviation from the section line. Gate 4 is near the point where the road turns to the southeast and appears to be on the section line between 36–103–77 and 1–102–77. Gate 5 is several hundred yards southeast of gate 4, on the section line between 1–102–77 and 6–102–76. Gate 6 is southeast of gate 5, in the western half of 6–102–76 and apparently on the east-west quarter line of section 6. Gate 7 is southeast of gate 6, in the southern half of 6–102–76, and it is apparently on the north-south quarter line of section 6. Gate 8 is on the section line between Sections 7 and 8,

102–76. Gate 9 is several hundred yards southeast of gate 8, in the western half of 8–102–76 and apparently on the east-west quarter line of section 8. Gate 10 is on the east-west section line which is the southern border of 9–102–76, near the western end of the section line. Gates 1, 2, and 10 are located where the road follows a section line. Gate 11 is on the section line between sections 17 and 16 of 102–76. None of the gates are locked on a regular basis. Some are tight and somewhat difficult to open. Gates 8, 9, and 10 are not really gates but are horizontal livestock guards which permit vehicular passage at a reduced speed without the driver having to leave the vehicle. The County Commissioners of Tripp County have authorized gates 1 and 2; these gates have been in place since before Sell began using the land in either of the two sections where the gates are located. Several years ago, Sell removed a fence which had been on the south side of the road between these two gates. As a result, gate 1 is necessary to prevent cattle from roaming onto U.S. Highway 183. Defendant Sell installed gates 4 and 5.

[¶ 27] This road is not an all-weather road. It is occasionally impassable in winter due to snow accumulation. The road is mostly a dirt road, but gravel has been placed on small portions of the road in the areas of Gates 8, 9, and 10. Plaintiff Mike Calhoon farms and ranches on land surrounding the road. He makes numerous trips on the road while farming. Hunters and others use the road as well.

[¶ 28] Both Greenwood and Star Valley Townships are organized civil townships. Greenwood Township does not maintain the portion of the road located within its borders. Star Valley Township maintains the portion of the road south of gate 9. Tripp County does not maintain any portion of the road and makes no claim to any portion of it.

[¶ 29] In connection with the construction of U.S. Highway 183, the United States granted a right of way on July 25, 1924, (plaintiffs' exhibit 127) and also on May 26, 1932, (plaintiffs' exhibit 125), both grants having taken land from the northwest corner of what is now known as T 2614 in 3–102–77. Both maps "recognize" the section line and show it to be 66 feet wide, the normal width of a section line highway. *See* SDCL 31–18–2. There is no indication on either map of any claim of trust status running to the middle of any section line. Nor is there any indication that "permission" was being granted to "take" or use the section lines.

[¶ 30] It is important at this point to examine some rather ancient history. The Fort Laramie Treaty of 1851, 11 Stat. 749, reported in full in II Kappler, Laws and Treaties (2d Edition, 1904) at 594, among other things, set off tribal boundaries for a number of tribes and made the various tribes responsible for depredations committed within the territory of the particular tribe. The Treaty of 1868, ratified in 1869, 15 Stat. 635, created the "Great Reservation" for the Sioux and set off lands "for the absolute and undisturbed use and occupation of the Indians", this including Tripp County.

[¶ 31] Later, separate Indian reservations were established by the Act of 1889, including the Rosebud Reservation which included Tripp County. The Act of March 2,1889, 25 Stat 888, included section 21: "That all the lands in the Great Sioux Reservation outside of the separate reservations herein described are hereby restored to the public domain, * * *." After dealing with certain allowed sales to homesteaders with specified compensation to be paid, Section 21 further provides: "Provided, that there shall be reserved public highways four rods wide around every section of land allotted, or opened to settlement by this act, the section lines being the center of said highways; but no deduction shall be made in the amount to be paid for each quarter-section of land by reason of such reservation. * * *." This section is somewhat unclear and does not answer the question as to whether it is applicable to not only lands then "restored

to the public domain" but as well to lands later restored. Nor has this narrow question apparently been decided by the United States Supreme Court or in the Eighth Circuit.

[¶ 32] The Public Highway Act, later codified at 43 U.S.C. § 932, was enacted in 1866. This Act was repealed on October 21, 1976, but with a savings clause that nothing in the repealer "shall be construed as terminating any valid right-of-way or other land use right or authorization." Section 8 of the Act of July 26, 1866, provides in pertinent part: "The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." 43 U.S.C. § 932. This Act had no application to Tripp County, still part of the reservation at that time. It has had application to Tripp County since March 2, 1907, but not as to allotted land or tribal trust land.

[¶ 33] South Dakota achieved statehood on February 22, 1889. South Dakota forever disclaimed "all right and title to the unappropriated public lands lying within the boundaries (of the new states, including South Dakota), and to all lands lying within such limits owned or held by any Indian or Indian tribes; and that until the title thereto has been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; * * *." Sec. 4, 25 Stat. 676 at p. 677.

[¶ 34] Tripp County was removed by Congress from the Rosebud Reservation on March 2, 1907, and portions of the county were thus restored to the public domain.

[¶ 35] The United States issued rights-of-way, i.e. granted permission, to Tripp County on November 9, 1926, for some of the portions of the road that are not located along section lines, this action having been taken pursuant to 25 U.S.C. § 311. The court must interpret this federal law and determine its application under the facts of this case. This statute provides: "The Secretary of the Interior is authorized to grant permission, upon compliance with such requirements as he may deem necessary, to the proper State or local authorities for the opening and establishment of public highways, in accordance with the laws of the State or Territory in which the lands are situated, through any Indian reservation or through any lands which have been allotted in severalty to any individual Indian under any laws or treaties but which have not been conveyed to the allottee with full power of alienation."

[¶ 36] The United States did not grant any valid permission for a public highway to Tripp County for the portions of the road in question that are located on section lines. In the language of the statute, there is no satisfactory evidence of "permission" having been granted. The involved parties may have been familiar with a statute that has been the law in South Dakota since 1870. SDCL § 31–18–1 provides: "There is along every section line in this state a public highway located by operation of law, except where some portion of the highway along such section line has been heretofore vacated or relocated by the lawful action of some authorized public officer, board, or tribunal." This statute, however, does not apply to Indian country. Maps used in connection with the grants and certain language in other documents discussing use or non-use of section lines (because of terrain problems) show a belief at that time by the Secretary and probably by Tripp County that the Secretary's permission pursuant to 25 U.S.C. § 311 was not required as to section lines and that no compensation need be paid to the Tribe or the individual holders of allotments as to the 33 feet of land on each side of the section line to be used for a section line road. The forms being used by the United States (as shown in portions of Exhibits 122 and 128) include the following language: "The proposed highway has been laid out to conform to section lines, except as hereafter stated. The departures from

section lines are as follows and the reasons as stated: * * *." Various Department officials certified, as shown in various exhibits, including Exhibit 126, that the "maps of definite location" accurately represented the described highway portions and that the lands as described in the "schedule of damages are all the Indian lands which are involved", a further indication that the Secretary did not consider the section lines to be "Indian lands" when the certifications were made. Also found within Exhibit 128 are Department (BIA) reports on applications for public highways. Following the description of the land to be used for the highway is a statement that the described land does not include "the portion which lies within the legal section line Right of Way * * *."

[¶ 37] There is no evidence of any record of the United States government that even purports to grant any rights to Tripp County for (a) the first half mile of this road (which is on the section line) as it proceeds east from U.S. Highway 183, the same running between fee land in 34–103–77 and T 2614 in 3–102–77; (b) a half mile segment on the section line between T 2860 in 36–103–77 and A 2611 in 1–102–77; (c) a half mile segment between A 2639 in 8–102–76 and A 2598.5 in 17–102–76; (d) any portion of the road as it continues between sections 9 and 16 in the vicinity of the Calhoon Ranch; and (e) the "missing segment" in the west half of 6–102–76 as described earlier in this opinion. Harold Compton, Realty Officer for the Rosebud Agency, an employee of the BIA, testified that no easement exists in BIA documents as to T 2614, as to the half mile segment between A 2611 and T 2860, as to a ½ mile segment on the section line between A 2639 and A 2598.5, and as to the portion of the roadway running down the middle of 17–102–76. His testimony is credible and is accepted by the court.

[¶ 38] SDCL 31–3–1 provides: "Whenever any road shall have been used, worked, and kept in repair as a public highway continuously for twenty years, the same shall be deemed to have been legally located or dedicated to the public, and shall be and remain a public highway until changed or vacated in some manner provided by law." SDCL 31–3–2 provides: "Notwithstanding § 31–3–1, the mere use by the public of any route of travel along or across public or private land, or the right-of-way of any railroad company for any period, shall not operate to establish a public highway and no right shall inure to the public or any person by such use thereof." The portion of the road at issue in this lawsuit has been used, worked, and kept in repair as a public highway continuously for more than twenty years so that, if SDCL 31–3–1 is applicable and SDCL 31–3–2 is not applicable, the same could be deemed to have been legally located or dedicated to the public and would therefore remain a public highway until changed or vacated in some manner provided by South Dakota law. The language of SDCL 31–3–2 taken by itself would indicate that SDCL 31–3–2 could be applicable to portions of this road since there has been "mere use by the public of any route of travel along or across public or private land" and this would not "operate to establish a public highway and no right of way shall inure to the public or any person by such use thereof". The publisher of the South Dakota Codified Laws has annotated *Serry v. Custer County,* 46 S.D. 395, 193 N.W. 143 (1923), under SDCL 31–3–2, stating that this section does not apply where the lands were public lands of the United States for more than 30 years before entry by a private owner. It is somewhat difficult to determine what was decided in this 1943 decision which largely involved the question of whether there was sufficient evidence to justify the decision of the trial court. This statement is found at page 144: "Such lands were at all times, until the entry of plaintiff's grantor, public land of the United States, and were therefore not within the proviso of section 1632, Rev. Pol.Code 1903." One cannot determine if the Supreme Court was paraphrasing what the trial court decided or was making its own statement. At the time

the South Dakota Supreme Court decided this case, SDCL 31–3–1 and 31–3–2 as they now exist were part of the same statute. See, for example, SDC 1939, § 28.0104. It is, of course, a dangerous practice to rely on annotations. The law in South Dakota is, however, apparently to the effect that neither SDCL 31–3–1 nor 31–3–2 have any application to public lands of the United States. The case does not address land held in trust for Native Americans or for a tribe. We know also that, in general, "Indian lands are not included in the term 'public lands' which are subject to sale or disposal under general laws." *Bennett County, South Dakota v. United States*, 394 F.2d 8, 11 (8th Cir.1968). It is not necessary to decide this question in this case since the court determines that South Dakota law does not apply to Tribal trust land or to allotted trust land as to which no valid "permission" was granted and this includes section lines as to which no valid "permission" was given. "A conveyance by the United States of land which it owns beneficially or * * * for the purpose of exercising its guardianship over Indians, is to be construed, in the absence of any contrary indication of intention, according to the law of the State where the land lies." *United States v. Oklahoma Gas & Electric Co.*, 318 U.S. 206, 209–10, 63 S.Ct. 534, 536, 87 L.Ed. 716 (1943). This principle of law does not apply in the absence of a valid "conveyance", even assuming that granting "permission" is a "conveyance."

[¶ 39] On April 2, 1957, the Board of County Commissioners of Tripp County attempted to remove this road from the Tripp County highway system and directed that the "care and control" of the road revert to Greenwood Township and Star Valley Township. This action was not approved at that time by the South Dakota State Transportation Commission or the South Dakota Department of Transportation. The action was therefore of no legal effect. SDCL 31–12–2, enacted in 1919, provides: "No county highway system shall be changed, altered, or modified except by authority of and in accordance

with a written executive order of the department of transportation. Any such change shall be shown on the map of the county highway system in the office of the county auditor and on such map in the department of transportation." SDCL § 31–3–19 states, in relevant part, "[N]o portion of the * * * county highway systems shall be vacated, changed, or located except with the approval of and in accordance with the order of the Department of Transportation to be first made." SDCL 31–1–3 provides: "All public highways, including cartways, lawfully established shall continue as established until changed or vacated in some manner provided by law."

[¶ 40] Finally, on May 11, 1983, upon recommendation by the Board of County Commissioners of Tripp County, the South Dakota State Transportation Commission by adopting Resolution No. 13979 removed from the Tripp county highway system some of the road in question, but not including the one mile section lying between Sections 3 and 34 in Greenwood Township.

[¶ 41] The road in question has not otherwise been formally abandoned, relocated or vacated. Tripp County, with authorization from the South Dakota State Transportation Commission has, since at least 1983, abandoned the road as a county highway. Abandonment is "[t]he surrender, relinquishment, disclaimer, or cession of property or of rights." Black's Law Dictionary, Sixth Addition. All the county ever had was some type of limited permission, something in the nature of an easement. It is significant that the county intentionally "walked away" from the easement. There is no evidence of any attempt, as to the road in question, to designate it as a minimum maintenance road by action of the Board of County Commissioners pursuant to SDCL 31–12–46 or by action of any township board of supervisors pursuant to SDCL 31–13–1.1.

[¶ 42] As to highways governed by state law, the South Dakota Supreme Court has held, "[V]acation or abandonment of a legally established public way

can only occur by some lawful method * * *. The appropriate governing board must act affirmatively to vacate or abandon a section line right-of-way * * *. The burden of proof is on the one obstructing a lawfully established public way to show vacation or abandonment. *Aasland v. County of Yankton*, 280 N.W.2d 666 (S.D. 1979); *Haley v. City of Rapid City*, 269 N.W.2d 398 (S.D.1978) * * *." *Thormodsgard v. Wayne Township Board of Supervisors*, 310 N.W.2d 157, 159 (S.D. 1981). The same court has held: "South Dakota law mandates inclusion of right-of-way easements along all section lines. SDCL 31–18–1. Abandonment, vacation, or relocation can only be accomplished through official action by statutorily authorized public officials, boards, or tribunals * * *." *City of Sioux Falls v. Hone Family Trust*, 554 N.W.2d 825, 825 (S.D.1996).

[¶ 43] SDCL 31–13–1 provides: "It shall be the duty of the board of township supervisors to arrange for the construction, repair, and maintenance of all secondary roads within the township." Thus, a highway within an organized township which highway is not part of the state trunk system, not part of a county highway system, and not a highway which the county has formally agreed to maintain under the provisions of SDCL 31–12–28 to 31–12–40 must be maintained by the board of township supervisors until the highway is abandoned or vacated as provided by law. The definition of a township highway is found at SDCL 31–1–5(3).

[¶ 44] The maps of definite location which have already been described are endorsed, as follows: "Approved subject to the provisions of the Act of March 3, 1901 Z (31 Stat. L. 1058, 1084), Department regulations thereunder; and subject also to any prior valid existing right or adverse claim." This endorsement or "stamp of approval" was discussed in *U.S. v. Oklahoma Gas & Electric Co.*, 318 U.S. 206, 63 S.Ct. 534, 87 L.Ed. 716 (1943). The question in that case was whether permission granted to the State of Oklahoma to establish a highway over allotted Indian land

included the right to permit maintenance of rural electric service lines within the highway bounds. The Supreme Court held that it did. The Court held that apparently the Secretary had never sought to resolve the problem presented in such case by any administrative ruling. Likewise, in the present case, there is no evidence of any administrative rulings. The Government did not offer in evidence at the trial of this matter any "Department regulations" as they now exist or as they existed in 1926. This is despite the fact that "regulations" did exist and may exist today. "The Department of the Interior, in its booklet entitled 'Regulations of the Department of the Interior Concerning Rights of Way over Indian Lands,' published in 1929, pointed out the various laws applicable to the granting of rights of way through Indian lands, tribal and allotted, and gave direction for procedure." *United States v. State of Minnesota*, 113 F.2d 770, 773 (8th Cir.1940). After reading this decision, the court raised the question as to these possible regulations to counsel and counsel for the government has now submitted, in August of 1998, "Regulations concerning Right of Way over Public Lands and Reservations for Canals Ditches, and Reservoirs and Use of Right of Way for Various Purposes" as approved on June 6, 1908, and including amendments made in May and November of 1912 and June of 1915. The government has also now recently submitted "Regulations of the Department of the Interior Concerning Rights of Way over Indian Lands" with an approval date of May 22, 1928. The court takes judicial notice of such regulations. Section 52 of the 1929 regulations provides:

Damages shall be assessed in each case so as to fully compensate the Indians for the damages sustained, and schedules of such assessment shall be prepared and submitted to the Secretary of the Interior for approval in accordance with the general instructions given in section 71–84 hereof. However, in making such assessments the superintendent or other

officer in charge will keep in mind the public nature of the project and make due allowance for the benefit which will result to the Indian owners of the land crossed. These benefits should be pointed out to the Indians when the matter of damages is taken up with them, and in cases where no actual damages will result or where the damages are equaled or exceeded by the benefits the Indians should be counseled to give their consent to the opening of the road without asking for damages. Forms for the use of the superintendent in making his report and in securing statements from the Indians are designated 5–104a and 5–104b. (See appendix, pp.24 and 25.)

Section 51 of the 1929 regulations provides:

Where the lands traversed have been surveyed, the proposed road or highway must follow section or allotment lines as far as practicable, and a satisfactory showing must be made for any departure therefrom.

[¶ 45] There is nothing in the record to indicate that anyone ever determined that the benefits of the road did result in the "section line property" having no value or that there was any intent to "fully compensate the Indians" for all of the land to be used for highway purposes. All indications are to the contrary as to the "section line property." No map submitted shows anything with regard to section lines being included in the property as to which permission was being granted. No schedule was ever prepared in connection with the "section line property" in compliance with Section 76 of the 1929 Regulations. Section 77 of such Regulations exempts "public highways" from the requirement that, while the schedules required by Section 76 were being prepared, the superintendent was to prepare a report as to "the cost or expense of the necessary field inspection and other work required in making appraisement of damages." There is no evidence of any such report being prepared to cover the "section line property." The government has conceded, and properly so,

in this action that "the Secretary considered the portion of the road on the section line a public right-of-way which did not require payment of damages." See letter from Assistant United States Attorney DuPris dated August 28, 1998.

[¶ 46] The Supreme Court, in considering what was done by the State of Oklahoma, stated: "The State has granted nothing not revocable at will, has alienated nothing obtained under the Act, has permitted no use that would obstruct or interfere with the use for which the highway was established, and has not purported to confer any right not subsidiary to its own or which would survive abandonment of the highway." 318 U.S. 206, 211, 63 S.Ct. 534, 87 L.Ed. 716. It is important to compare what the State of Oklahoma did with what Tripp County and the State of South Dakota have done. Tripp County has been permitted by the State of South Dakota to abandon or alienate everything the county received from the Secretary, with the county being permitted to "foist it off" upon two townships, one of which has manifested its intention to do nothing to maintain the road. The other organized township has partially and rather haphazardly "maintained" the road. The county reserved no right over the roadway, contrary to what Oklahoma did. The "authorizing statute", 25 U.S.C. § 311, speaks of the "opening and establishment of public highways" being governed by state law but does not speak to the vacation or closing of any such highways. The county has permitted uses which would obstruct or interfere with the very use for which the public highway was established. In considering an interpretation of law, such as in the present case, the court must consider, in the language of the Oklahoma case, whether the interpretation "is necessary to the fulfillment of the policy of Congress to protect a less-favored people against their own improvidence or the overreaching of others * * *." 318 U.S. at 206, 63 S.Ct. 534. Tripp County has failed and refused to fulfill its responsibilities as to the por-

tions of the road for which permission was legally extended under 25 U.S.C. § 311, i.e. those portions of the roadway off the section lines. The county, unlike what was done in Oklahoma, has abandoned and alienated what it received under the Act and the permission is therefore no longer valid, even as to those portions of the road for which compensation was paid when the "permission" was given. An easement may be extinguished by abandonment. *Lethin v. United States*, 583 F.Supp. 863, 871 (D.Or.1984). This is especially the case when the intent to do so is clear and there is no evidence of any intent by Tripp County to attempt to resume use of the easement. Even if state law were applicable, Tripp County "abandoned" the easement as permitted by state law.

[¶ 47] The court has carefully considered *Bennett County, South Dakota v. United States*, supra., and finds the case to be applicable to the present case in several respects. That case involved land entirely within a reservation and the question presented was whether Bennett County was entitled, by virtue of the 1866 Public Highway Act or section 21 of the Act of 1889, to a highway easement across allotted Indian lands. The answer was "no." It is important to remember that, in the present case, neither Tripp County nor any other entity paid anything for the land taken along the section lines. "The power of the United States to control the affairs of its Indian wards is subject to constitutional limitations and does not enable the United States, without paying just compensation, to appropriate land of an Indian tribe. *United States v. Klamath and Moadoc Tribes*, 304 U.S. 119, 123, 58 S.Ct. 799, 82 L.Ed. 1219 (1938) * * *." *Bennett County*, 394 F.2d 8, 11. *Bennett County* is instructive in other ways: "All questions with respect to rights of occupancy in land, the manner, time and conditions of extinguishment of Indian title are solely for consideration of the federal government * . * *. As a corollary to this proposition, it follows that third parties, and in particular states and municipalities, acquire only such rights and interests in Indian lands

as may be specifically granted to them by the federal government." *Id.* at 11. What was done by the Secretary as to Tripp County and this road was far from a "specific grant". In fact, it was pointedly a very limited grant, not including section lines, it having obviously been the belief of the Secretary in those times that highways existed along section lines in Indian Country and therefore no permission was required from the Secretary. The Secretary intentionally required no compensation for the land to be used along section lines. Further: "To assure the utmost fairness in transactions between the United States and its Indian wards, any intent to deprive Indian tribes of their rights in land, or otherwise bring about the extinguishment of Indian title, either by grants in abrogation of existing treaties or through other Congressional legislation must be clearly and unequivocally stated and language appearing in such grants and statutes is not to be construed to the prejudice of the Indians (citing cases)." *Id.* at 12. There is no clear and unequivocal grant of any right being granted to Tripp County to use 33 feet along every section line, especially without the payment of compensation. The Secretary acted "to the prejudice of the Indians" and this is not to be permitted. Further: "Our analysis of Section 21 in its entirety leads us to conclude it is applicable only to those lands *outside* the separate reservations, that is, to those lands 'restored to the public domain.' * * * Upon examining other sections of the Act of 1889, we are persuaded to believe that Congress intended not only that the Sioux be compensated for land ceded back to the public domain but also intended that they be compensated for any land appropriation *within* the new reservations." *Id.* at 14. Congress also intended that Indians be compensated for any land appropriation outside the reservation which land is tribal or allotted trust land. Further: "These sundry provisions of the Act of 1889 reinforce our conclusion that the easement proviso of Section 21 of that Act applies only to lands open to settle-

ment (for which payment is to be made). It is inconceivable that Congress would thus carefully assure to the Sioux payment for an easement within the ceded territory, and at the same time impose a servitude for a highway easement upon lands *within* the new reservation without also providing compensation. * * * Without a more clearly expressed provision, we cannot believe that Congress intended to impose a servitude upon land within the reservations without requiring the consent of the tribe or Secretary, and without payment of compensation for the taking." *Id.* at 15. Likewise, this court cannot conceive that Congress intended to impose a servitude on tribal trust land or allotted land in trust outside the reservation and without the payment of any consideration.

[¶ 48] *Bird Bear v. McLean County,* 513 F.2d 190 (8th Cir.1975), involved section line roads. The Court stated, at page 193: "However, 25 U.S.C. § 311 and 357 expressly provide for the opening of *such highways* across individually allotted Indian land either with the permission of the Secretary of the Interior or after compliance with state condemnation procedures. *See United States v. State of Minnesota,* 113 F.2d 770 (8th Cir.1940)." (emphasis supplied) This is a recognition that section lines, including the 33 feet on each side thereof, are subject to the requirements of 25 U.S.C. § 311 and cannot be alienated by implication, guess, speculation, or without compensation.

[¶ 49] The court is not unmindful of the fact that South Dakota, like Oklahoma, is "spotted .with" restricted lands held in trust for Native American allottees. The court is fully aware that certain "complications and confusion" will follow from applying to highways abutting such lands rules differing from those which apply to non-Native American lands. The question of taking property without just compensation was not an issue in the Oklahoma case as it was in the Bennett County case. If a unit of government desires to use Native American property for highway purposes, application should be made to the Secretary. If approved, just compensation will

be paid. A right of way may also be obtained through eminent domain under 25 U.S.C. § 357. Neither has yet occurred. That the Secretary may have intended to "give away" Indian land is of no consequence to this court. There is no "bigger spender" than someone spending someone else's money or property. As Henry Clay observed in March of 1829, "government is a trust, and the officers of the government are trustees; and both the trusts and the trustees are created for the benefit of the people."

[¶ 50] The foregoing constitutes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

[¶ 51] NOW, THEREFORE, IT IS ORDERED, as follows:

1. The authorized roadway is 33 feet wide in the first half mile as it proceeds east from U.S. Highway 183 and is for the next half mile 66 feet wide. This portion of the road remains as part of the county highway system of Tripp County. The road is 33 feet wide in the next half mile portion, namely that portion which is a part of 35–103–77. This is a township secondary highway and is to be maintained by Greenwood Township. When the Rosebud Indian Reservation was diminished in 1907, these portions of the highway in question became subject to SDCL 31–18–1 and other provisions of statute dealing with section line highways.

2. No highway use shall be made of T 2614, including the 33 feet now being used for highway purposes, without further action by the Secretary as authorized by federal law or condemnation as authorized by federal law.

3. No highway use shall be made of A 2611.5, A 2357.5, A 2611, A 2606, A 2615, A 2616, A 2640, or A 2601, without further action by the Secretary as authorized by law or condemnation as authorized by federal law.

4. No highway use shall be made of T 2860, A 2639, A 2598.5 or A 4807, including the 33 feet now being used for highway

purposes, without further action by the Secretary as authorized by federal law or condemnation as authorized by federal law.

5. The road is 33 feet wide in the half mile south of A 4807 to the extent that such road is a part of the Northwest ¼ of 16–102–76 and this road is a township secondary highway.

6. The Secretary or the operator or lessee of allotted or tribal trust land may remove all gates and fences encroaching on allotted and tribal trust land as to which permission has not been granted by the Secretary and highway uses are not allowed as described above. All remaining questions as to the use of gates or fences or both in connection with that portion on the Tripp County highway system and that portion on a township system shall be determined as provided by South Dakota law, and if the parties challenge any such action, the state court may fashion an appropriate remedy.

7. The motion of the Tribe to dismiss the Tribe as a party is granted.

8. The motion of the United States to dismiss the United States as a party is denied.

9. The request from the United States that the court take judicial notice of various documents filed as Doc. # 66 is denied. The documents were not submitted at the trial of this case. The court earlier permitted parties to locate and file applicable Department Regulations but did not authorize the filing or submission of additional documents as evidence. In addition, the documents are not sufficiently legible, are not subject to explanation and the court has no intention of trying, *sua sponte,* to interpret or explain such documents.

10. No injunction shall issue and no damages shall be awarded. No costs shall be allowed to any party.